WOODARD, Judge.
This is a consolidated appeal arising out of a unilateral termination of a commercial contract of lease and alleged unlawful eviction of plaintiff-appellant’s, Timothy W. Kite d/b/a Timothy Kite Enterprises, jewelry store from defendants-appellees’, Gus Kaplan, Inc. and Gustave Kaplan, department store, Number 97-57, and an action on a promissory note held by plaintiff-appellee, Gus Kap-lan, Inc., against Timothy Kite Enterprises, defendant-appellant, Number 97-58. From a judgment by the trial court in favor of Gus Kaplan and Gustave Kaplan in Number 97-57, that the Timothy Kite was not unlawfully evicted, Kite now appeals. In Number 97-58, Timothy Kite Enterprises does not appeal judgment for Gus Kaplan, Inc. on the promissory note.
FACTS
Timothy Kite (Kite) first contacted Gus-tave Kaplan (Kaplan) in 1988, expressing his interest in Gus Kaplan, Inc.’s (GKI). new jewelry department. GKI had been located in MaeArthur Village in Alexandria, Louisiana since 1967 but had plans to move to a new location at Gus Kaplan Drive, which was the site of a former D.H. Holmes department store. Kaplan was the President of GKI.
Kite was a certified jeweler and gemologist, who was knowledgeable and experienced in the fine jewelry business. Over the next three years, he continued to maintain contact with Kaplan and informally discussed, either with Kaplan or with his son, Sidney Kaplan, the possibility of Kite’s relocating to Alexandria to work in the new Gus Kaplan store to operate its fine jewelry department.
In May 1992, Kite and his fiance, Ann M. Watkins, flew from Las Vagas, Nevada to Alexandria to talk with Kaplan. Kaplan was very interested in having him operate the jewelry department. Since, Kite did not wish to become an employee of GKI at the proposed salary, they discussed the possibility of Kite’s operating the jewelry department as a lessee. He was initially reluctant to relocate to Alexandria and doubted his ability to acquire the necessary capital and inventory of jewelry necessary to start the jewelry department. Kaplan persuaded him to consider a Small Business Administration (SBA) loan. Kite obtained an SBA loan application on May 18, 1992. Within days, he and his fiance were married and immediately returned to Alexandria to work on the SBA application.
laKite had initial problems with the SBA application and told Kaplan about them. Kaplan provided assistance by granting him a $25,000.00 loan of which $15,000.00 was immediately used to pay Kite’s preexisting debts. Kite used the remaining $10,000.00 as collateral for his SBA loan. On September 10, 1992, he obtained a loan for $185,000 to finance the jewelry départment.
On August 3,1992, Kite and GKI executed a written lease contract whereby GKI leased certain designated space in the new Gus Kaplan store to Kite for the purpose of operating a fine jewelry department. • The lease contract provided for a primary lease term of five years, beginning October 1, 1992, and the monthly rental was to be fourteen percent of the jewelry department’s gross retail sales. The contract contained the following pertinent clauses:
That LESSOR does by these presents, lease, let and deliver unto LESSEE, acknowledging due delivery and possession thereof, certain store space and reserved stock space situated and located in the store of LESSOR, known as “GUS KAP-LAN” in the TownCenter [sic] Shopping Center in Alexandria, Rapides Parish, Louisiana, said space illustrated in Appendix A, hereby made a part hereof.
*476 All of the mentioned store space, and reserved stock space is located in the store of LESSOR, and may be changed from time to time by LESSOR at its option and expense.
[[Image here]]
2. PURPOSE OF LEASE: The premises are herein leased for the purpose of conducting a retail sales department of jewelry. It is mutually agreed and understood by and between LESSOR and LESSEE, that LESSEE shall by these presents have the exclusive right and privilege to merchandise and sell all items usually sold by a fine jewelry department.
[[Image here]]
9. OPERATIONS: LESSEE’S department shall be arranged as part of, and in conformity to, LESSOR’S store, and shall be conducted under the trade name of the LESSOR and in such manner that said department shall appear to be conducted as a department of and an integral part of the LESSOR’S store, and so that it shall appear to the customers in the Store that all sales from LESSEE’S department are made as sales from the Store. LESSEE’S department shall be run and operated at all times in a manner consistent with the general type and character of the business conducted in the Store and the service connected therewith. ^LESSOR acknowledges that it is familiar with the type of operation run by LESSEE and is satisfied that said operation is suitable. All communications to customers shall be in the name of the LESSOR only. LESSEE’S department shall be conducted at all times upon the same standard of business policy, ethics and integrity, in relation to the methods of sales of merchandise as are maintained through LESSOR’S Store, and in conformity with all reasonable rules, regulations and policies established or promulgated from time to time by the Store for the government and control of the Store. General janitorial service will be provided by LESSOR; however it is the LESSEE’S responsibility to maintain its department to accepted standards of neatness and cleanliness.
[[Image here]]
Í7. OWNERSHIP OF IMPROVEMENTS: Any improvements made by LESSEE, including, but not limited to showcases, display cases, counters, work tables and other improvements necessary to perform the purposes of this Lease, shall remain the property of LESSEE, and upon termination of this Lease, LESSOR may purchase said improvements at the appraisal value.
The map, which appears as Appendix A to the lease contract, shows the location of Kite’s leased premises to be the same location which had been specifically designated for the fine jewelry department in the earlier D.H. Holmes store. Kite testified that its location and appurtenances made it very effective for the display and sale of fine jewelry. It was situated in a central, prominent, highly trafficked area, directly in front of the main entrance of the store. It contained adequate space for his jewelry-inventory and was properly equipped to meet the specialized needs of a fine jewelry department. Its high quality jewelry display eases had been custom made for that location. In order to protect the expensive jewelry merchandise from theft, the cases could be individually locked, and the tops of the cases were secured by a metal bead which held the glass in place. Inside the cases were custom made pads on which the jewelry could be properly displayed. The cases were illuminated from above by special high intensity lighting. The department was also furnished with individually locking storage drawers for the merchandise. Featured in the department were eight Duratrans displays, which are photographic transparencies, backed by high intensity light for the purpose of advertising the type and quality of merchandise being sold. Also Kite had a motion detector installed in the ceiling, which were required by |5practical necessity as well as by the provisions of the jeweler’s insurance policy under which the department was insured.
The Gus Kaplan department store opened for business on October 29, 1992. Kite began operating a fine jewelry department in *477 the store. According to testimony of disinterested witnesses, he maintained sufficient inventory of high quality fine jewelry to stock all the display cases in the department.
After the grand opening and during his first couple of months of business from October to December 1992, his fine jewelry business did very well. Soon, however, it began to decease. By March and April 1993, the business was struggling. GKI was also struggling during these months. In spite of this, Kaplan attempted to help Kite by giving him advances in May 1993 and later in December 1993. In July 1993, Kaplan extended the payment period on Kite’s $25,000.00 loan. In August 1993, Kaplan granted another payment extension plan to him, wherein GKI was to withdraw $5,000.00 from Kite’s sales on a monthly basis until the loan was repaid in full. In November 1993, Kite was unable to make his loan payment to GKI. Again, he requested that GKI not take the $5,000.00 monthly payment out of the October sales and asked for a new payment schedule for this note. Kaplan agreed.
In December 1993, Kaplan signed a letter of guarantee to a jewelry supplier, Diamond Basics, to assist Kite in obtaining inventory in excess of his credit limit on GKI’s consignment. Kite testified that there was some tension or disagreement between him and Kaplan during this time, as Kaplan put pressure on him to advertise, display, and sell a line of lesser quality jewelry supplied by Sommers and Sommers, the firm of Kaplan’s son-in-law, Walter Sommers. Kite agreed. The record establishes that Kite went to extraordinary lengths to accommodate Kap-lan’s requests in this regard in order to maintain a harmonious relationship with him, even though, legally, he did not have to do so under the terms of the lease.
Kaplan testified that in January 1994, he noticed that Kite’s inventory of better merchandise was declining and that the area was not full of merchandise. Sales for January 1994 were very low, and Kite’s inventory had decreased.
In February 1994, Kaplan asked Kite whether he had considered moving his fine jewelry operation into the Alexandria Mall, and Kite responded that, financially, he was unable to make such a move at that time. On February 24,1994, Kaplan suggested that Kite move to a different location in the Gus Kaplan store. Kaplan |6testified that he made this suggestion three times without getting any response from Kite.
The next day, Kite received a telephone call from Kaplan, who was, as described by Kite, “furious” and “livid” that Kite had not talked to him about moving in the store. Kaplan told him that if he wanted to, he could force Kite to move the department without his consent and that he would tell the SBA that he did not want Kite in the store anymore.
On February 26, 1994, when Kite arrived for work at the start of business, he discovered that his jewelry department had been moved to a new location, closer to the east entrance of the . store. His merchandise had been removed from, the display eases and locked away in some unknown place. Kaplan had taken some of Kite’s jewelry, which he later returned, as well as certain business and inventory papers of Kite’s, which he never returned. The eases were open and empty. The countertops were covered with a chaotic jumble of cosmetics. The Duratrans were covered and taped over. Kite was so distraught at what had happened that he publicly cried in the store. Immediately, he went home to tell his wife and returned to the store, later that morning to take photographs.
There were signs pointing to the location of the new jewelry department, which contained no merchandise of any land. The new location had previously been used for selling exercise outfits, swimsuits, and the like.
Kaplan testified that the relocation of Kite’s jewelry department was effected the morning of February 26, 1994, before the store’s 10:00 a.m. opening. He admitted that he did not inform Kite, either that morning or the previous evening, that the relocation was imminent. He admitted that he never made a written demand on Kite under the terms of the lease to move him with in the store. Kaplan further acknowledged that the lighting of the new location was inadequate for fine jewelry and that the motion *478 detector was not moved to there until a week later. Although Kaplan knew that steps needed' to be taken to correct deficiencies and prepare the new department for the display and sale of fine jewelry, he admitted that no such steps had been taken before effecting the relocation.
Later that day, Kite and his wife removed all of his fine jewelry merchandise from the safe in his private office and took it home. He was particularly disturbed that Gus Kap-lan employees had access to his locked jewelry display eases, when they were |7not supposed to have keys to those cases for security reasons. He considered himself to have been evicted from the fine jewelry department, and he found the new location to be totally deficient. It lacked adequate space, proper lighting, locking drawers, and other necessary amenities. The display cases could not be locked and were entirely inappropriate for the display of fine jewelry.
An expert witness testified for Kite. The expert testified that the new location in the store for Kite’s business was inappropriate and unsuitable for a fine jewelry department. He testified that it had inadequate display space and work space, with only half of the number of display cases as the old location. The configuration of the display eases was suitable for displaying clothing, not jewelry. The display cases were not shatterproof and could not be locked or secured to protect the merchandise. The drawers could not be locked. He found the new location inferior to the old one in all respects and unsuitable for the display and sale of fine jewelry. The expert testified that it would have taken eight to ten weeks to renovate the new location to make it suitable as a fine jewelry department, due to the time required to make the necessary custom-made displays and pads, and that the interruption of business for that period of time would have been ruinous and would have made it difficult to re-establish the department’s clientele.
By letter dated February 28, 1994, and hand delivered to Kaplan, Kite inquired whether the lease was being terminated, and he made demand for the return of his property. On that same day, Kaplan’s attorney, Edward Kaplan, sent Kite a letter, advising him that his location in the store had been changed and that he was in default of the lease for failing to conduct the leased department consistent with the manner in which Gus Kaplan operates. The store operations manager, Michael Mixon, told Kite that GKI would do “whatever” to resolve this matter, but Kite refused to discuss it.
On March 2, 1994, Kite returned to the store and cleaned out his safe. Kaplan’s attorney advised him in writing, on March 8, 1994, that Kaplan had plans to enhance the new location of the fine jewelry department. Kite replied two days later, advising Kaplan that he had retained an attorney and to direct any other inquires to him.
Kite did not make any further payments on his note with GKI. In suit no. 176,347, he sued GKI, Kaplan, and their liability insurer, American Central Insurance Company, for the damages he sustained as a result of the wrongful actions of GKI and Kaplan. GKI filed suit in Alexandria City Court, seeking judgment against Kite for lathe unpaid balance of its $25,000.00 note, suit no. 177,856. Kite filed a reconventional demand in that suit, seeking damages for Kaplan’s wrongful actions. All defendants denied liability to Kite. American Central Insurance Company denied that its liability insurance policy provided coverage for Kite’s claims.
The two suits were consolidated for trial. Trial was held on July 9-11,1996. The trial court rendered judgment (1) in favor of GKI on its demand against Kite on the promissory note; (2) in favor of GKI, Kaplan, and American Central Insurance Company, dismissing Kite’s claims against them; and (3) in favor of American Central Insurance Company, decreeing that its liability policy provided no coverage for the claims asserted by Kite against its insured. Judgment was signed on July 29, 1996. Kite timely filed a Motion for Appeal on September 4, 1996.
ASSIGNMENTS OF ERROR
Appellant claims that the trial court erred in finding that:
1. GKI and Kaplan did not unlawfully evict Kite from the leased premises, tortiously and in violation of the lease, *479 and in thus finding GKI and Kaplan not liable to Kite for his resulting damages.
2. American Central’s liability insurance policy provides no coverage for Kite’s claims herein.
3. Kite is not entitled to damages from defendants for their actions.
LAW
Unlawful Eviction Claim
The trial court held that the forcible relocation of Kite’s jewelry business, without warning and to a clearly inadequate location in the, store, was not a breach of the relocation clause of the lease between the parties. This holding was an error of law.
As this lease was negotiated between two knowledgeable businessmen and, by its terms, did not contravene good morals or public policy, it is enforceable in accordance with its terms. While it is true that the relocation clause of the lease gave GKI the right to relocate Kite in the store at its option and expense, it was not an 19unlimited right. It was constrained by the provisions of La.Civ.Code art. 2692, relating to the obligations of lessors to deliver and maintain the premises in a condition suitable for its intended use. Neither the relocation clause nor GKI’s exercise of that right nullified its obligations under Article 2692, which states:
Obligations arising from nature of contract
The lessor is bound from the very nature of the contract, and without any clause to that effect:
1. To deliver the thing leased to the lessee.
2. To maintain the thing in a condition such as to serve for the use for which it is hired.
3. To cause the lessee to be in peaceable possession of the thing during the continuance of the lease.
The “purpose” clause of the lease stated that “LESSEE shall by these presents have the exclusive right and privilege to merchandise and sell all items usually sold by a fine jewelry department.” (Emphasis added). At the time the lease was negotiated, both parties expected that Kite’s leased premises would have the characteristics of a fine jewelry department. These characteristics included appropriate location in the store, appropriate special intensity fighting, appropriate and secure custom made display cases, individually locking storage drawers for the merchandise, and adequate storage space for Kite’s jewelry inventory. It is significant that the location of Kite’s jewelry business was planned for the location of what had been the D.H. Holmes fine jewelry department before GKI took over the building.
In order for GKI to lawfully exercise its rights, unilaterally, under the relocation clause of the lease and in compliance with Article 2692(2) and (3), it would have had to prepare, in advance, a location which had the same characteristics regarding lighting, display cases, security, and storage space as that location which Kite, originally, had leased and then to direct him to move into the new location within a reasonable timé so as not to disrupt Kite’s business. Kaplan and GKI did not have the right “to make any alteration in the thing during the continuance of the lease.” La.Civ.Code art. 2698.
| ípThe facts establish that Kaplan, acting for GKI, did not honor his obligation under arts. 2692 and 2698. Instead, he chose self help, at his sole discretion, in his own way, and without warning or consideration for the agreed upon needs and requirements of Kite’s business. He forcibly removed Kite from the location, which was adequate for the sale of fine jewelry, to an area which was clearly inadequate for its sale, an area which would have taken eight weeks to recondition into a leasehold facility comparable to the original. It is of no small moment that, at the time of the move, the new location was inferior and unsuitable for Kite’s use intended under the lease.
The practical effect of Kaplan’s actions was to destroy Kite’s already struggling business. Financially, he could not wait eight weeks for GKI to rebuild the leased premises to the characteristics of a fine jewelry department, if indeed it ever would or could have been done. Further, Kaplan was well aware of *480 Kite’s financial condition at the time of the forced relocation, and being a businessman, well understood the adverse ramifications of his actions on Kite’s business. The conclusion is inescapable that Kaplan, while acting for GKI, for all practical purposes, unlawfully evicted Kite from the lease by the forced relocation of his business to inadequate facilities, thereby dissolving the lease. See La. Civ.Code art. 2728.
In reaching this result, we are not following the fourth circuit’s decision in New Orleans Hat Attack, Inc. v. New York Life Insurance Co., 96-0055, 95-0056 (La.App. 4 Cir. 11/30/95); 665 So.2d 1186. The facts in the instant case are distinguishable from that case, which also concerned litigation arising out of a relocation clause of a lease. We find the facts in the instant case to be more egregious. The wrenched relocation, by fierce self help methods and without warning and regard for the safety of his property, to conspicuously inadequate facilities, with a foreseeable detrimental effect on Kite’s business, are the most important demarcating factors, convincing us that the trial court’s reliance on Hat Attack was legal error.
Kaplan’s Personal Liability
Next, we address whether Kaplan can be held personally liable for his wrongful eviction of Kite. Kite argues that Kaplan’s actions in evicting him from the premises, likewise, constituted a tort under La.Civ. Code art. 2315. Functionally, this is a dispute in contract in which the obligations that have been breached were voluntarily as-sumedjnby GKI in the course of commercial activities between the parties. Normally, the law of tort should not apply to disputes that are essentially breaches of contract, otherwise, other public policies found in laws, shielding corporate officers from liability in certain situations, would be rendered without practical effect. Tort law should not be allowed to control all of the terms through which persons transact their affairs with others. Traditionally, it has not attempted to protect the intangible economy of financial interests of a party in the proper performance of a contract. Ordinarily, Kaplan’s actions, in wrongfully evicting Kite, would be privileged as actions taken on behalf of GKI as a corporate officer, and no personal liability would attach to Kaplan.
Notwithstanding, the law of Louisiana does recognize a narrow tort by a corporate officer that can render him personally liable for his actions. In 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228, 234 (La.1989), for the first time, the Louisiana Supreme Court recognized that a corporate officer had a duty “to refrain from intentional and unjustified interference with the contractual relations between his employer and a third person” and established the elements of proof for this tort as follows:
For purposes of analysis, the action against a corporate officer for intentional and unjustified interference with contractual relations may be divided into separate elements: (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer’s knowledge of the contract; (3) the officer’s intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer. Id.
In the case sub judice, a contract of lease existed between GKI and Kite. Kaplan, as President of GKI, had complete knowledge of the contract and the parties’ intent, as he negotiated and supervised it. He personally participated in the events that lead to Kite’s unlawful eviction, and he made the decision to breach the contract of lease with Kite in the egregious manner in which he did. The unlawful eviction of Kite caused him substantial damages, which were directly brought on by Kaplan’s actions.
The more difficult element of proof to establish Kaplan’s personal liability is the matter of the “absence of justification on the part of [Kaplan].” Id. This requires some | i2discussion. Two criteria must be proven to establish Kaplan’s justification for his actions in breaching the contract of lease with Kite. Kaplan’s actions must have been within the “scope of his authority or [he] acted knowing *481 ly contrary to the best interests of his corporation.” Id. at 235. Clearly, Kaplan, as President of GKI, acted within the scope of his authority in breaching the lease with Kite. But, was his action “knowingly contrary to the best interests of the corporation?” Id. In order to have the benefit of the corporate veil, Kaplan must have acted with a “proper motive” to be granted the protection of the privilege which encompasses the scope of his intent to act in the best interests of the corporation at the time of the unlawful eviction. If Kaplan’s motive was malicious in breaching the lease with Kite, then his actions were without “justification” and the final element of proof to hold Kaplan personally responsible for the breach of the lease will have been met. Note, Piercing the Corporate Veil: Personal Liability of a Corporate Officer for International Interference with Contract: 9 to 5 Fashions, Inc. v. Spumey, 51 LaJL.Rev. 141 (1990); 'See generally, WKG-TV Video Electronic College, Inc. v. Reynolds, 618 So.2d 1023 (La.App. 1 Cir.1993).
The facts of this breach of the lease establish that Kaplan acted deliberately and maliciously to drive Kite out of business and off the premises. There was absolutely no justification for the manner in which he chose to relocate Kite. Thus, we find that Kaplan’s actions in breaching the lease without justification meets the elements of proof required by 9 to 5, holding him personally liable to Kite for an unjustified interference with Kite’s contract relationship with GKI.
In reaching this conclusion, we are not unmindful that GKI is a closely held corporation. But, corporate officers in close corporations should not be allowed to hide behind the corporate veil at the expense of wronged third parties. Although the preservation of the corporate veil is important in a commercial economy, it should not provide a shield to corporate actors who act maliciously in inducing a breach of contract with a third party, as happened here.
AmericaN Central’s Coverage
The trial court held that the American Central Commercial General Liability insurance policy, which insured GKI and Kap-lan, provided no coverage for Kite’s claims. This, too, was an error of law. The contract of insurance, in the following provisions, provides coverage for Kite’s claims.
hsSECTION 1 — COVERAGES
[[Image here]]
COVERAGE B. PERSONAL AND ADVERTISING INJURY LIABILITY
1. Insuring Agreement.
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of “personal injury” ... to which this coverage part applies....
b. This insurance applies to:
(1) “Personal injury” caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or telecasting done by or for you.
[[Image here]]
SECTION V — DEFINITIONS
[[Image here]]
10. “Personal injury” means injury, other than “bodily injury,” arising out of one or more of the following offenses:
[[Image here]]
c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;
(Emphasis added).
As support for its argument that it owes no coverage, American Central urges us to rely on exclusionary provisions. Initially, we must note that the exclusions it cites are irrelevant. Notwithstanding, even if we were to analyze these exclusions in the best light for American’s purpose, we find that they would fender the contract ambiguous when considered in conjunction with the above quoted provisions. Consequently, this ambiguity would have to be construed in favor of coverage for the insureds. Garcia v. St. Bernard Parish School Board, 576 So.2d 975 (La.1991); Dubois v. Parish Government Risk Management Agency—Group Health, 95-546 (La.App. 3 Cir. 1/24/96); 670 So.2d 258.
*482 |uWe find no merit to American’s contention. We must enforce this contract as written and hold that the insurance policy provides coverage for all of Kite’s damages caused by Kaplan’s and GKI’s wrongful eviction. See La.Civ.Code art.2046.
Damages
We must now determine the damages for which GKI and Kaplan are liable.
La.Civ.Code art. 2696 states, “If the lessee be- evicted, the lessor is answerable for the-damage and loss which he sustained by the interruption of the lease.”
Damages for the breach of a contract of lease “are measured by the loss sustained by the obligee and the profit of which he has been deprived.” La.Civ.Code art.1995. If a person breaches a contract of lease in good faith, he “is liable only for the damages that were foreseeable at the time the contract was made.” La.Civ.Code art.1996. But, a party that breaches an obligation in bad faith is liable for damages to a considerably greater extent than a good faith breach of an obligation. “An obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform.” La.Civ.Code art.1997. Comment (b) to Article 1997 explains that “[a]n obligor is in bad faith if he intentionally and maliciously fails to perform his obligation.”
Bond v. Broadway, 607 So.2d 865, 867 (La.App. 2 Cir.1992), writ denied, 612 So.2d 88 (La.1993), construed Article 1997 by quoting the definition of “bad faith” from Black’s Law Dictionary: .
The opposite of ‘good faith’, generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one’s rights or duties but by some interested or sinister motive.
The court then stated, “The term bad faith means more than' mere bad judgment or negligence, it implies the conscious doing of a wrong for dishonest or morally questionable motives.” Id. See also Weysham v. Harney, 518 So.2d 1059, 1061 (La.App. 4 Cir.1987), writ denied, 521 So.2d 1172 (La.1988).
Kaplan and GKI’s forcible relocation of Kite’s business without warning and in the callous manner in which they did so, with no regard for Kite’s property, was not the result of an “honest mistake” or mere “bad judgment or negligence.” It was a | ^deliberate and malicious act which they had to know would probably drive Kite out of business and ultimately off the premises.
Wé hold that the actions of the defendants were in “bad faith” and that Kite is entitled to all the damages he incurred, foreseeable or not, which were the direct consequence of Kaplan and GKI’s failure to perform their obligations under the contract of lease. La. Civ.Code art.1997.
Kite argues that he is entitled to nonpecu-niary, as well as pecuniary, damages, pursuant to La.Civ.Code art.1998. That article states, in part, “[rjegardless of the nature of the contract, these damages may be recovered also when the obligor intended, through his failure, to aggrieve the feelings of the obligee.” Comment (d) to Article 1998 states “[ujnder this article, an obligee may recover damages for the nonpecuniary loss he sustains when the obligor fails to perform in circumstances that give rise to the presumption that the obligee’s embarrassment or humiliation was intended by the obligor.” We must presume that Kaplan and GKI intended to produce the embarrassment, humiliation, and a loss of business reputation with Kite’s customers, which they effectuated, since they took no actions to spare him of such an anguishing, public display. Thus, they are háble to Kite for nonpecuniary damages, pursuant to article 1998, as well.
Next, we turn to the defendants’ liability under article 2315. A lessor’s actions regarding a lessee may constitute both breaches of the lease contract and tortious acts, at the same time, rendering him hable for the full range of pecuniary and nonpecu-niary damages pursuant to that article.
In New Orleans Riverwalk Associates v. Robert P. Guastella Equities, Inc., 94-2092 (La.App. 4 Cir. 11/16/95); 664 So.2d 151, writ granted, 96-0199 (La.4/8/96); 671 So.2d 327, the court found that the lessor had breached the lease agreement in bad faith. The court *483 stated, “Not only was Riverwalk [the lessor] liable on the contract, but it is also liable for past damages based on lost profits because Riverwalk also committed intentional torts in prohibiting Guastella [the lessee] from carrying on its business.” Id. at p.ll; 158. Guas-tella was awarded substantial damages against Riverwalk for its actions which were similar to those of GKI and Kaplan, constituting both a tort and breach of lease. Damages were awarded in Riverwalk for lost profits for those of the entire remaining term of the lease.
The pecuniary damages to which Kite is entitled are detailed below.
| i6First, pursuant to paragraph 17 of the lease, all improvements Kite made were to remain his property. Upon termination of the lease, GKI could purchase them at their appraisal value. Kite made improvements to the leased premises at his own expense, including a motion detector, customized jewelry displays, Duratrans, safe, and alarm system for which he has never been reimbursed. The evidence establishes that the value of these improvements is $8,246.22.
Second, Kite is entitled to an award for business losses for having to sell off his inventory and for lost future profits. He testified that as a result of the eviction he had to sell his inventory at a greatly reduced price in order to meet some of his obligations; that he sold his inventory for $29,-000.00; that his value represented nine to ten percent of its retail value.' The person who purchased Kite’s inventory, Carl Marusak, testified that his purchase price approximated twenty percent of the wholesale value of the jewelry and that the commercial mark up in the industry was two hundred to three hundred percent above its wholesale value. Thus, the retail value of the jewelry was $290,000.00 for two hundred percent and $435,000.00 for a three hundred percent mark up.
Mike Tassin testified for Kite as a expert in accounting. He was of the opinion that, following an evaluation of Kite’s accounting data, Kite had made a profit of $93,350.00 over the sixteen months he was in business. In his testimony, Kite modified this figure to $73,500.00, after he realized that he had mistakenly not informed Tassin of a $20,000.00 loan he had made from his wife. Thus, for sixteen months he was in business, Kite averaged a monthly profit of $4,593.75. He is entitled to an award for his lost profits for the remaining forty-four months of the lease. However, we are unable to determine the exact relationship between Kite’s losses relative to his inventory and loss of future profits. Specifically, we cannot determine the number of months of lost profit Kite incurred that he would not have suffered except for the forced sale of his inventory at nine to ten percent of its value. Stated another way, under normal circumstances, the orderly sale of his inventory at retail value would have likely resulted in profit for an unknown number of months that would have to be deducted from the calculations of total lost profit he •is to be awarded. Accordingly, we must remand the case to the trial court to retry these pecuniary damage issues, with specificity.
| nKite asked this court for a judgment of $750,000.00 for nonpeeuniary damages for embarrassment, humiliation, emotional anxiety, and destruction of his credit rating, all of which flowed directly from the defendants’ actions. These damages are not susceptible of precise measurement. Thus, much discretion is left to the court “for the reasonable assessment of these damages.” La.Civ.Code art.1999. We find that, based on the record before us, they should be set at $50,000.00, $5000.00 of which Kaplan is personally liable.
Kite is also entitled to nonpeeuniary damages for the defendants’ conversion of his personal property, which was confiscated on February 26, 1994 during the eviction. Fourteen items of jewelry were taken, as well as some of Kite’s business and inventory papers. The jewelry was returned a week later, and the documents were never returned. We find that Kite is entitled to an award of $3,000.00 for these damages for which Kaplan is personally hable. See La. Civ.Code art.1999.
Because of the destruction of his business, Kite was unable to maintain his payments on the SBA loan and other financial obligations. The largest of these obligations *484 was $141,891.79 for the SBA loan. The evidence established that other obligations totaled $14,135.39. We decline to award him these damages which totaled $156,027.18, as he would have been required to pay these obligations from the sales proceeds during the course of operating his business.
CONCLUSION
For the foregoing reasons, the decision of the trial court is reversed. Judgment is rendered against the defendants, Gus Kap-lan, Inc., Gustave Kaplan, and American Central Insurance Company, in solido, in favor of Timothy W. Kite d/b/a Timothy Kite Enterprises in the frill sum of $53,246.22. An additional $8,000.00 in damages is rendered against Kaplan personally. We remand this ease to the trial court for determination of the pecuniary damages against the defendants, in solido, for loss of inventory and loss of future profits of plaintiff, consistent with this opinion. All costs are charged to the defendant-appellees in these proceedings.
REVERSED, RENDERED AND REMANDED.
DECUIR, J., concurs in part and dissents in part for reasons assigned by AMY, J.
PETERS, J., concurs in part and dissents in part and assigns written reasons.
AMY, J., concurs in part and dissents in part and assigns reasons.