798 So.2d 1141 (2001)
SUN DRILLING PRODUCTS CORPORATION
v.
Jerry J. RAYBORN, Sr.
No. 2000-CA-1884.
Court of Appeal of Louisiana, Fourth Circuit.
October 3, 2001.
*1144 Robert E. Barkley, Jr., Mark P. Seyler, Barkley & Thompson, L.C., New Orleans, LA, and George Pivach II, Pivach & Pivach, L.L.C., Belle Chasse, LA, and Arnd N. vonWaldon, Reed Smith, L.L.P., Pittsburgh, PA, Counsel for Appellants.
Peter J. Butler, Richard G. Passler, Breazeale, Sachse & Wilson, L.L.P., New Orleans, LA, and Philip F. Cossich, Jr., Les A. Martin, Cossich, Martin, Sumich & Parisiola, Belle Chasse, LA, Counsel for Appellee.
Court composed of Judge STEVEN R. PLOTKIN, Judge MIRIAM G. WALTZER, Judge PATRICIA RIVET MURRAY, Judge DENNIS R. BAGNERIS, and Judge MAX N. TOBIAS Jr.
WALTZER, Judge.
In this appeal, we must consider the personal liability of various individuals, associated with a corporation in various capacities, for the corporation's termination *1145 of a minority shareholder's employment and royalty contract. The individuals include Hypolete Astugue (the President of the corporation and a director), Douglas Heller, George Hickox, Jr. and Steven Park (directors and shareholders of the corporation), and William Dimeling, Richard Schreiber and John Tutem (shareholders of the corporation).

STATEMENT OF THE FACTS
In 1994, Jerry J. Rayborn owned Sun Drilling Products Corporation. Rayborn began negotiations with a group of Philadelphia investors concerning the transfer of a majority interest of Sun. On 3 June 1994 Rayborn and the partnership of the Philadelphia investors (Heller, Hickox, Dimeling, Schreiber and Park) signed a letter of intent/exclusivity to facilitate the transfer. This exclusivity provision required that for a certain period of time Rayborn would only consider selling shares to the Philadelphia investors and required that any income of the company would inure to the benefit of the buyers.
On 8 December 1994, the Rayborns,[1] Heller, Hickox, Dimeling, Schreiber & Park (HHDS&P, a general partnership), and Sun entered into the original Merger Agreement. Under the Merger Agreement, Rayborn sold a 75% interest in Sun to HHDS & P. He also agreed to reimburse Sun for the amount of Sun's cash which Rayborn used to pay his 1993 personal tax liability. [Article II, Section 2.2, Paragraph (e).] On 8 December 1994 Rayborn executed a promissory note to Sun for $318,738 (the amount of his 1993 personal tax liability), and on 23 January 1995 he wrote Sun a check for the amount of the note.
The Merger Agreement contains various provisions related to payment from Sun to Rayborn for his 1994 tax liability, but it does not contain any mention of any agreement to pay Rayborn $1.3 million or make him whole on his 1993 and 1994 tax liability. Article II, Section 2.2, Paragraph (c) of the Merger Agreement provides that Sun's promissory note to Rayborn will be increased from $2.5 million by an amount equal to one-half Rayborn's estimated 1994 federal and state income tax liability, not to exceed $300,000. Paragraph 3.26 (page 20) of the Merger Agreement provides, "There are no contracts, agreements, purchase orders, commitments, leases, agreements, understandings or arrangements, including loan arrangements between the company and any of its officers, directors or shareholders, except as set forth on Schedule 3.26." Moreover, Article XVIII, Section 18.3 provides, "This Agreement constitutes the entire agreement of the parties hereto respecting its subject matter and supersedes all negotiations, preliminary agreements and prior or contemporaneous discussions and understandings of the parties hereto in connection with the subject matter hereof. This agreement may be amended, modified or supplemented only by a writing signed by all parties [sic] by their duly authorized representatives." Sections 3.9 and 3.10 of the Agreement provide that the company has "no liabilities of any nature," except those disclosed in the Interim Balance Sheet and has not suffered "a material adverse change" in the liabilities of Sun since the October 1994 balance sheet annexed to the original Merger Agreement. The agreement continues, "And none shall be entered into by the company from the date hereof through closing date [February 1995] without the prior written consent of *1146 HHDS & P which shall not be reasonably withheld or delayed." The alleged oral agreement between Rayborn and Heller is not referenced in any written agreement between the parties.
In late December 1994, Rayborn instructed Sun's president, Hypolete Astugue, to enter on Sun's internal books Sun's 1994 profits, totaling $1,382,120, as a debt owed to a shareholder, Rayborn. Astugue complied.
In late January 1995, Rayborn wrote a letter to the Philadelphia investors informing them that unless he was reimbursed for his 1993 and 1994 tax liability, the deal was off. In January 1995, the parties amended the Merger Agreement in writing to provide that Sun would reimburse Rayborn for any 1995 tax liability incurred by him for Sun.
On 21 February 1995, the parties to the Merger Agreement completed the deal by amending the original Merger Agreement of 8 December 1994. The February amendment to the Merger Agreement specifically addresses Rayborn's 1994 personal tax liability. The amendment provides, "The requirement in Section 2.2(c) of Article II of the Agreement that Jerry J. Rayborn, Sr. furnish an estimate of his 1994 federal and state income tax liability and evidence thereof is waived and the parties agree that the principal amount of the Note is increased from $2,500,000 to $2,800,000. The parties further agree that the $300,000 increase in the principal amount of the Note is a fair approximation of one-half of the 1994 federal and state income tax liability of Jerry J. Rayborn, Sr. and there shall be no subsequent increase or decrease in the principal amount of said Note based upon the actual 1994 federal and state income tax liability of Jerry J. Rayborn, Sr." A second amendment to the Merger Agreement provides, "The requirement in Section 8.5 of Article VIII of the Agreement that Company deliver to HHDS & P a letter from Ernst & Young (`Accountant's Letter') addressing the matters outlined in Section 8.5(a)-(c) of the Agreement is waived and HHDS & P hereby accepts the Pro Forma Beginning Balance Sheet in the form and substance delivered by Company to HHDS & P." Shortly before the closing, Ernst & Young prepared two balance sheets for the company, one version reflects the debt to Rayborn and the other does not.
On the day of the final amendments to the Merger Agreement on 21 February 1995, Sun and Rayborn entered into a Management, Technical Services and Royalty Agreement. In this contract, Sun agreed to employ Rayborn at a yearly salary for a term of five years after the February 1995 closing and to pay him a 7% royalty on Sun's gross sales for a term of ten years, specifically, from May 1998 until May 2008.
In addition to all the written agreements, both Rayborn and Doug Heller testified that they reached an oral agreement that Rayborn would be made whole on his personal tax liability. Rayborn testified that the amount for his 1993 and 1994 tax liability totaled approximately $1.3 million. However, Rayborn also repeatedly testified that Heller made this commitment as a representative of Sun. Heller testified that he agreed "Sun `would make him [Rayborn] whole' on any 1994 tax liability."
On 24 August 1995 Rayborn wrote two checks on Sun's account. He used the first to pay $249,948 to Sun's 1994 Profit Sharing Contribution. He wrote the second check to himself in the amount of $415,000. He testified that he did not seek or have any approval to disburse these funds. Moreover, he admitted he wrote the second and larger check to antagonize the Philadelphia shareholders. The check contained a written inscription, "Partial *1147 Payment Due JJR for 1994 Corporate taxes."
On 21 September 1995, Sun's directors, including Rayborn and Heller, met and ratified the payment for the Profit Sharing Contribution. According to the minutes signed by a majority of the board members, but not Rayborn, the board resolved that Sun's internal balance sheet would be corrected, as of 31 December 1994, to remove the $1,318,840.42 indebtedness owing to Rayborn (Exhibits 71), that Sun would pay Rayborn $75,000, representing partial reimbursement of his 1994 personal taxes, and that Rayborn would finalize his 1994 personal tax liability to determine the "remaining amounts due Jerry Rayborn."
On 5 October 1995 Sun paid $75,000 to Rayborn. On 19 March 1996, Sun paid Rayborn an additional $75,000. Moreover, Sun paid Rayborn the full value of the outstanding notes executed at the sale of the 75% interest in Sun, or $2,800,000 ($300,000 to compensate Rayborn for his 1994 tax liability). The parties agree that Sun paid Rayborn $591,449 after the closing to compensate him for his personal tax liability.[2]
In the fall of 1996, HHDS & P began negotiations with companies interested in facilitating the sale of Sun. Rayborn was excluded from these discussions. However, he testified that he agreed with efforts to sell Sun. HHDS & P attempted to purchase Rayborn's interests in Sun, including his royalty interest, but Rayborn refused these offers.
In February 1997, after attempts to buy Rayborn's remaining interests in Sun failed, HHDS & P sought legal advice on terminating Rayborn. The Employment and Royalty Contract between Sun and Rayborn provides that Sun may terminate Rayborn's employment for cause, which is defined as:
(i) Performance by JJR [Rayborn] of illegal or fraudulent acts, or criminal conduct or misconduct or gross negligence relating to the activities of SDP [Sun]; or
(ii) Performance by JJR of any criminal acts involving moral turpitude having a material adverse effect upon SDP, including without limitation, a material adverse effect upon SDP's profitability, reputation or goodwill;
(iii) Negligent failure by JJR to perform his duties in a manner which he knows, or has reason to know, to be in SDP's best interests which is not cured within thirty days of receipt by JJR of written notice thereof;
(iv) Refusal by JJR to carry out reasonable instructions of the Board of Directors not inconsistent with the provisions of this Agreement which is not cured within thirty days of receipt by JJR of written notice thereof;
(v) Failure to inform the Board of Directors of any information which may have a material impact on SDP of which JJR has knowledge within 30 days of JJR becoming aware of such information;
(vi) Violation of any directive of the Board of Directors by JJR which is not cured within thirty days of receipt by JJR of written notice thereof;
(vii) Action by JJR without the authorization of the Board of Directors which has or is reasonably likely to have a material adverse impact on SDP; or
(viii) Any other negligent material breach of JJR's obligations hereunder *1148 which are incurable or which he fails to cure promptly and in no event more than thirty (30) days after receiving written notice thereof.
More importantly, the contract provided that Sun "shall pay to JJR, for a period of 10 years commencing May 1, 1998 and ending May 1, 2008, a royalty in an amount equal to 7% of the Gross Product Sales." Moreover, the contract provided for termination of Sun's obligation to pay Rayborn these royalties when, "SDP terminates JJR's employment because JJR has taken action without the authorization of the Board of Directors of SDP which is reasonably likely to have a material adverse impact on SDP."
On 27 February 1997 Rayborn wrote the investors a letter informing them of an oral agreement in which Heller agreed to "make you [Rayborn] whole on the $1,300,000 tax issue." In early March Heller, Hickox and Astugue met with HHDS&P's attorney to discuss terminating Rayborn. Soon after that meeting, Rayborn presented a letter to Astugue for signature acknowledging Sun's debt to Rayborn in the amount of $1.3 million. Astugue believed Rayborn attempted to bribe him at this meeting by writing $100,000 on a piece of paper and telling Astugue that this letter could be very valuable. Rayborn testified that he gave all of his key employees large gifts, cash or loans, valuing $100,000 or more after the merger. Moreover, he agreed that he may have written $100,000 on a piece of paper for Astugue.
Astugue reported this incident to HHDS & P, and on 11 March 1997, a majority of Sun's Board of Directors advised Astugue to terminate Rayborn for cause, thus terminating his royalty interest. Sun terminated Rayborn's employment and payment of his royalties by letter on 17 March 1997. This suit followed Rayborn's termination.

STATEMENT OF THE CASE
On 17 March 1997, Sun filed suit against Rayborn for damages for breach of fiduciary duty and breach of contract and for declaratory judgment that it had cause, under the employment contract, to terminate Rayborn's employment and royalty benefit.
On 1 May 1997 Rayborn answered the suit and filed both a reconventional demand against Sun and various third party demands against Astugue, HHDS&P, Douglas Heller, George Hickox, Jr., William Dimeling, Richard Schreiber, Steven Park, John Tuten,[3] and Susan Reese.[4] Rayborn sought rescission of the merger/sale of 75% of Sun (Counts I and II), damages for fraud (Count III), breach of fiduciary duty (Count V), breach of contract (Count VII), violation of Louisiana's Unfair Trade Practices and Consumer Protection Law (Count IX), tortious interference with a contract (Count XI) and conspiracy to commit these various violations (Counts IV, VI, VIII, X, XII). Moreover, Rayborn demanded damages for mental and emotional pain and suffering and injury to his reputation (Counts XVI and XVIII).
In his reconventional demand and third party demand, Rayborn alleges, "In connection with the Merger, Rayborn was to receive, inter alia, (a) $9.5 million cash at closing, (b) a non-interest bearing promissory note payable to him from New Sun in the principal amount of $2.8 million with *1149 one-half of the principal being due in 1997 and the other one-half being due in 1998 (the "Note"), (c) a five year employment contract with New Sun, (d) a royalty contract for a period of ten (10) years with New Sun, and (e) Rayborn would remain as Chairman of the Board." Rayborn alleges that the investors did not intend to perform.
After a trial on the merits, the trial court issued extensive Reasons for Judgment on 20 May 1999. The trial court found both that Sun did not have "cause" to terminate either Rayborn's employment or the royalty benefit and that Rayborn failed to prove by a preponderance of the evidence that the purchasers did not intend to honor the agreements executed with Rayborn for the transfer of ownership of Sun from their inception, but that the evidence establishes that the termination of Rayborn's royalty interest in Sun was a process begun after Rayborn failed to respond to the offer to buy him out. Moreover, the trial court found that the evidence clearly establishes that an agreement was reached concerning Rayborn being "made whole" for his 1993 and 1994 tax liability, as a condition of the merger/sale, that Heller agreed that Rayborn was to be compensated for a specific amount, $1,318,040, and that Rayborn was reasonable in his belief that there was a legitimate debt due him, even in the absence of specific proof as to the amount.
In August 1999, Sun filed a petition for Chapter 11 Bankruptcy protection and moved to stay the state court proceedings. The federal bankruptcy court stayed the proceedings regarding Sun but remanded the case regarding the claims against the individuals.
On 9 March 2000, the trial court issued its judgment. The trial court determined that Rayborn's termination was without cause and pursuant to a conspiracy between HHDS & P, Heller, Hickox, Dimeling, Schreiber, Park, and Astugue "to intentionally cause harm to Rayborn and to wrongfully, fraudulently and in bad faith cause Sun to fire Rayborn for the purpose of terminating his royalty." The trial court awarded Rayborn damages, consisting of his lost salary and benefits (undetermined after trial), product royalty benefits (undetermined after trial), and attorney's fees and costs under the Royalty contract (undetermined after trial).[5] The trial court awarded Rayborn $726,591 against HHDS & P, Heller, Hickox, Dimeling, Schreiber, and Park (jointly, severally and solidarity). However, the trial court found that Rayborn had not proven fraud or error sufficient to justify rescission of the sale/merger of Sun or violation of Louisiana's Unfair Trade Practices Act.
FIRST ASSIGNMENT OF ERROR: The trial court erred by finding an oral agreement between Heller and Rayborn.
The investors argue that Rayborn failed to prove the existence of an oral contract between the individual investors and Rayborn for payment of $1.3 million.
LSA-C.C. art. 2232 requires the plaintiff to prove all aspects of a contract, including its terms. Strickland v. Marathon Oil Co., 446 F.Supp. 638, 641 (E.D.La.1978). Plaintiff must prove the facts supporting the existence of a contract by a preponderance of the evidence. Id. Moreover, the plaintiff, claiming the existence of an oral contract for the payment of money above $500 in value, must prove its existence and terms, by at least one credible witness and other corroborating *1150 circumstances. LSA-C.C. art. 1846 and Executive Recruitment, Inc. v. Reed and Carnrick Pharmaceuticals, 474 So.2d 473, 474 (La.App. 4 Cir.1985). Together these articles place a heavy burden on Rayborn. However, the plaintiff may serve as the one credible witness. Moreover, only general corroborating circumstances are required to support plaintiffs claim. Id.
Rayborn testified that Heller agreed to "make him [Rayborn] whole" for his 1993 and 1994 tax liability. Although Rayborn testified that Heller personally made this promise, he testified that he believed Heller made this promise as an agent for Sun. Rayborn derived the amount, $1.3 million, since the sum equaled, or nearly equaled Sun's profits for 1994. Before the February closing at which Heller admits orally agreeing, on behalf of Sun, to reimburse Rayborn for his 1994 tax liability, Rayborn ordered Astugue, the President of Sun, to add a debt to Sun's internal books. The entry provided that Sun owed Rayborn its profits for 1994, an amount totaling $1,318,840.42. For the February closing, Ernst & Young, the accounting firm long employed by Sun, prepared two beginning balance sheets for the company after the closing. One version of the balance sheet retained the debt and one did not. The record is unclear on which version of the balance sheet the parties relied. However, the trial court found, and we find ample evidence in the record, that Sun's internal books[6] continued to show the indebtedness until September 1995. In September 1995, a majority of Sun's Board of Directors resolved that this debt should be removed from Sun's books, effective December 1994.
The trial court relied on Rayborn's testimony and this entry to find that an oral contract existed between Rayborn and HHDS & P for the payment of $1.3 million. We believe the trial court erred in relying on the entry on Sun's books, as the only corroborating evidence of this oral agreement. However, we must consider the record as a whole in determining whether the trial court erred in concluding that Heller agreed on behalf of himself and his partners to reimburse Rayborn for his personal tax liability in the amount of $1.3 million.
We recognize that Heller admitted making an oral agreement with Rayborn regarding Rayborn's personal tax liability for 1994. Sun paid Rayborn $591,449 for his personal tax liability after the February closing. Rayborn testified that Heller agreed to "make him whole" for his 1993 and 1994 personal tax liability. Rayborn testified that Heller made this agreement as an agent of Sun. Rayborn bears the burden of proving both the existence and terms (including the amount) of the oral agreement. We do not find that the record establishes that Rayborn proved by a preponderance of the evidence that Heller personally agreed to pay Rayborn $1.3 million. Only Rayborn's testimony supports the finding that Heller personally agreed to pay Rayborn $1.3 million. Rayborn's attempts to establish proof of the obligation after the February 1995 closing until his termination in March 1997 consistently referenced Sun's indebtedness, as opposed to a debt owed by the individual investors. Other than Rayborn's conflicting testimony, the record contains no evidence to corroborate the existence and terms of the alleged oral agreement between the individual investors and Rayborn. Therefore, we must reverse the trial court's judgment awarding *1151 Rayborn $726,591 on an alleged oral agreement between Rayborn and the individual investors.
SECOND ASSIGNMENT OF ERROR: The trial court erred by awarding Rayborn damages against the individuals for Sun's breach of contract.
Heller and his associates argue that the trial court erred by concluding that Sun terminated Rayborn's contract, for employment and royalties, without cause. Sun terminated Rayborn's employment in 1997. The Employment and Royalty Contract provided the company could terminate the contract for "cause." To terminate both Rayborn's employment and royalty benefit, Sun needed to prove both that Rayborn acted without the authorization of Sun's Board of Directors and that this action had or was reasonably likely to have a material adverse impact on Sun. The trial court concluded that Sun did not have cause to terminate either Rayborn's employment or his royalty benefit. Thus, the court concluded that Sun breached its contract with Rayborn. Unfortunately, Rayborn's claims against Sun are not before us. Sun is not a party to this appeal. The individual investors appeal a judgment against them, not Sun.
However, since the determination of whether Sun breached its contract with Rayborn could affect the outcome of this appeal, regarding the individuals' liability, we must resolve the issue. Without proof of a breach of the contract, no cause of action lies for tortious interference with a contract against Astugue. See Hemmans v. State Farm Ins. Co., 94-0496 (La.App. 4 Cir. 3/21/95), 653 So.2d 69, 77. The trial court concluded that Sun breached its contract with Rayborn when it terminated him.
The trial court found that Sun failed to prove that Rayborn acted without authorization of the Board. However, Rayborn admitted he acted without Board approval on at least two occasions. He wrote two separate checks, each for a significant amount, on Sun's accounts without Board approval and without seeking such approval or authority. Although the Board ratified Rayborn's actions with regard to one check for the employee profit sharing plan, the Board did not approve the second, larger check. Rayborn wrote the second, larger check to himself in the amount of $415,000. Heller, Astugue and even Rayborn testified that this amount constituted a large amount of Sun's cash reserves. Moreover, Heller and Astugue testified that this expenditure compromised both Sun's "Subchapter S" corporation status and certain arrangements with Sun's creditors. Rayborn testified that he wrote this check to antagonize the individual investors. He did not testify, nor did he offer any evidence, to contradict Heller and Astugue's testimony that this expenditure was reasonably likely to have a material adverse impact on Sun.
The trial court found that the Board ratified this unauthorized, and potentially detrimental, action by demanding Rayborn repay the $415,000. Although Sun demanded that Rayborn repay the $415,000 and Rayborn did comply with the demand, we do not believe such restitution constitutes ratification of such unauthorized behavior. Moreover, Rayborn argues that he had the authority to write checks on Sun's accounts. However, we have reviewed Sun's by-laws and believe checks for such an amount needed the authority of at least two officers of Sun. Although Rayborn was an approved signatory on Sun's checking account, such responsibility clearly does not confer authority to spend such a large sum of Sun's money. Additionally, Rayborn admitted that he wrote this check for an inappropriate purpose *1152 and without proper authority. We believe the trial court erred in concluding that Sun terminated Rayborn's employment without cause.
The trial court found that Sun used these lapses in conduct as a pretext for terminating Rayborn's Employment and Royalty Contract. However, in deciding whether Sun terminated Rayborn for cause under the contract, Sun's motives are irrelevant. When a contract is not ambiguous or does not lead to absurd consequences, a court must enforce it as written and its interpretation is a question of law for a court to decide. C.C. art. 2046 and American Deposit Insurance v. Myles, 00-2457 p. 5 (La.4/25/01); 783 So.2d 1282, 1286. In determining whether Sun had cause, under the terms of the contract, for Rayborn's termination, the appropriate inquiry ends with a determination of whether Rayborn acted without Board authorization and whether such action had or was reasonably likely to have a material adverse impact on Sun. The contract does not require any consideration of the parties' motives. Although the trial court concluded that Sun did not have cause to terminate Rayborn, we find no evidence in the record to support this conclusion. Rayborn admitted he acted without authorization, and the record contains uncontroverted evidence that his actions were reasonably likely to have a material adverse impact on Sun. Except for the fact that Rayborn's unauthorized actions did not ultimately impact Sun adversely, there is no evidence in the record to contradict the conclusion that his actions were reasonably likely to adversely impact Sun. Rayborn's testimony supports this conclusion. He testified that he wrote the $415,000 check to antagonize the investors, regardless of the consequences to Sun.
We find no evidence in the record to support the trial court's conclusions. For these reasons, we believe the trial court erred in concluding that Sun breached its contract with Rayborn by terminating him without cause.
THIRD ASSIGNMENT OF ERROR: The trial court erred when it awarded damages against the individual investors for fraud.
The investors argue that the trial court erred by awarding Rayborn damages for breach of contract after finding the investors defrauded him. Rayborn argues on appeal that the investors defrauded him, since they never intended to pay him for his 1993 tax liability. However, the trial court specifically found that Rayborn failed to prove fraud in the inducement of the contract. A cause of action for intentional fraudulent misrepresentation as to present or past facts exists in Louisiana. A party who is injured by fraud and deceit of another has a cause of action for damages. Pittman v. Piper, 542 So.2d 700, 702 (La.App. 4 Cir. 4/13/89). Fraud, however, cannot be predicated on unfulfilled promises or statements as to future events. Fraud may be predicated on promises made with the intention not to perform at the time the promise is made. Dutton and Vaughan, Inc. v. Spurney, 600 So.2d 693, 698 (La.App. 4 Cir. 3/26/92). The Louisiana Civil Code defines fraud in Article 1953.
Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may result from silence or inaction.
Two elements are necessary to prove fraud: (1) an intent to defraud and (2) actual or potential loss or damage. Williamson v. Haynes Best Western of Alexandria, 95-1725 (La.App. 4 Cir. 1/29/97), 688 So.2d 1201, 1239, writ denied 97-1145 (La.6/20/97), 695 So.2d 1355. *1153 Federal courts applying Louisiana law indicate that reliance is an element of a claim for fraud. Abbott v. Equity Group, Inc., 2 F.3d 613, 624 (5th Cir.1993). Moreover, for fraud or deceit to have caused plaintiff's damage, he must at least be able to say that had he known the truth, he would not have acted as he did to his detriment. Whether this element is labeled reliance, inducement, or causation, it is an element of a plaintiff's case for fraud. In re Ford Motor Company Vehicle Paint Litigation, 1997 WL 539665 (E.D.La.8/27/97). The party alleging fraud need only prove these elements by a preponderance of the evidence. Circumstantial evidence, including highly suspicious facts and circumstances surrounding a transaction, may be considered in determining whether fraud has been committed. Williamson, supra at 1239.
The trial court found that Rayborn failed to prove that the investors did not intend to perform at the time of the various agreements. However, the trial court concluded that the investors defrauded Rayborn and thus found them personally liable. We agree with the trial court that the record does not contain sufficient evidence of the investors' intent to defraud Rayborn. Moreover, Rayborn did not answer the appeal and challenge this finding.
The record contains no evidence that Rayborn relied to his detriment on the investors' misrepresentations or omissions in the performance of the contract. We do not disagree with the factual findings of the trial court. The investors, through Astugue, either intentionally or negligently misrepresented Sun's opinions regarding Rayborn's job performance. The investors did not fully disclose to Rayborn the facts of their attempts to sell Sun. However, Rayborn neither alleged nor proved how these misrepresentations or omissions caused him damage. Although the record convinces us that the investors did not disclose important information, including Sun's potential liability to Rayborn for the enormous royalty benefit to prospective buyers, the record contains no evidence that Rayborn relied on these misrepresentations or omissions to his detriment. Rayborn proved that the investors failed to disclose particular information to him and to other individuals. Moreover, he proved damages, but we find no evidence in the record that the investors' omissions or misrepresentations caused his damages or his termination.
FOURTH ASSIGNMENT OF ERROR: The trial court erred by awarding Rayborn damages against the individuals for breach of fiduciary duty.
The investors argue that the trial court erred by finding them personally liable to Rayborn for breach of fiduciary duty. They argue that Rayborn did not have a personal right of action against Astugue, an officer of Sun, and the directors/shareholders, Heller, Hickox, and Parks.
Under LSA-R.S. 12:91 officers and directors stand in a fiduciary relation to the corporation's shareholders as well as to the corporation itself. Nevertheless, it is well settled that a shareholder of a corporation does not generally have a right to sue personally for alleged losses sustained by the corporation due to mismanagement or breach of fiduciary duties. A shareholder may only sue to recover losses to a corporation resulting from mismanagement and breach of fiduciary duties secondarily through a shareholder's derivative suit. Lawly Brooke Burns Trust v. RKR, Inc., 96-1231 (La.App. 1 Cir. 3/27/97), 691 So.2d 1349, 1353. In such a derivative action, the shareholder is only a nominal plaintiff and the recovery is for the corporation. Dennis v. Copelin, 94-2002, *1154 p. 8 (La.App. 4 Cir. 2/1/96), 669 So.2d 556, 560.
If the breach of fiduciary duty causes a direct loss to the shareholder or causes damage affecting the shareholder personally, a shareholder may have the right to pursue a claim individually for breach of fiduciary duty to the corporation under LSA-R.S. 12:91. However, in situations where the alleged loss to the individual shareholder is the same loss that would be suffered by other shareholders, the loss is considered to be indirect. Where the shareholder, but not the corporation, suffers a loss, that loss is considered a direct loss to the shareholder, and the shareholder may have a right to sue individually. Lawly Brooke Burns Trust, supra at 1353.
The facts in Rayborn's suit are distinguishable from both Dennis and Lawly. In Dennis, the plaintiff, a shareholder in various corporations, sued individual officers and directors of these corporations for loss of his investment resulting from mismanagement of the corporation. In Lawly, a shareholder sued the individual officers and directors of a corporation for losses to the corporation resulting from mismanagement and breach of fiduciary duties. Rayborn has sued both Sun and certain individual directors, officers and shareholders of the corporation as a creditor of both the corporation and the individuals. Such a position is more analogous to Dutton & Vaughan v. Spurney, supra at 697. In Dutton & Vaughan, a creditor of a corporation sued the officers and directors of the corporation for breach of fiduciary duty. This court held that although officers and directors owe a fiduciary duty to their corporation and its shareholders, they do not owe such a duty to persons or entities, contracting with their corporation. Id. Rayborn is not suing the individuals or the corporation in his capacity as Sun's shareholder, but he is claiming that these individuals and the corporation caused him personal damage. As this court explained in Dennis, in such cases, it is important "to distinguish between a personal right of action.... and a corporate right of action seeking redress for breach of fiduciary duty." In Wilson v. H.J. Wilson Co., Inc., 430 So.2d 1227, 1234 (La.App. 1 Cir. 4/5/83), the court found that a minority shareholder has a right of action against a majority shareholder for breach of a contract between the two parties. We do not believe our conclusion in this case disturbs this holding. Rayborn has sued the various individuals for alleged breach of the oral agreement concerning his tax liability, and we believe he has such a right of action. However, he has sued various individuals, attempting to pierce the corporate veil, for Sun's alleged breach of its contract with Rayborn. Because Rayborn is not suing the individuals for losses he suffered as a shareholder but for losses he suffered as a creditor of the corporation or the individuals, Rayborn has not stated a cause of action against these individuals for breach of their fiduciary duty under LSA R.S. 12:91.
FIFTH ASSIGNMENT OF ERROR: The trial court erred by awarding breach of contract damages against the individuals for intentional interference with a contract.
Heller, his partners, and Astugue argue that the trial court erred by awarding Rayborn damages against them for intentional interference with Rayborn's employment and royalty contract. The trial court determined that Astugue intentionally interfered with Rayborn's contract with Sun and awarded Rayborn damages.
*1155 An officer of a corporation owes an obligation to a third person having a contractual relationship with the corporation to refrain from acts intentionally causing the company to breach the contract or to make performance more burdensome, difficult or impossible or of less value to the one entitled to performance, unless the officer has reasonable justification for his conduct. The officer's action is justified, and he is entitled to a privilege of immunity, if he acted within the scope of the corporate authority and in the reasonable belief that his action was for the benefit of the corporation. 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228, 231 (La.1989).
An officer is privileged to induce the corporation to violate a contractual relation, or make its performance more burdensome, provided that the officer does not exceed the scope of his authority or knowingly commit acts that are adverse to the interests of his corporation. When officers knowingly and intentionally act against the best interest of the corporation or outside the scope of their authority, they can be held liable by the party whose contract right has been damaged. Id.
There are strong reasons that corporate officers should enjoy immunity from liability for intentional interference committed within the scope of corporate authority for the corporation's benefit. Since officers owe fiduciary obligations to the corporation and its shareholders and hold policy making positions, their fidelity and freedom of action aimed toward corporate benefit should not be curtailed by undue fear of personal liability. However, the officer's privilege should not be absolute, it should be limited by the purpose for which it is granted, i.e. to allow him to fully perform his fiduciary duty as authorized by the corporation. When the officer's action is detrimental to the corporation or outside the scope of his authority, the officer should be responsible for his intentional acts of interference with the contract rights of another. 9 to 5 Fashions, Inc., supra at 232.
For purposes of analysis, the action against a corporate officer for intentional and unjustified interference with contractual relations may be divided into separate elements: (1) the existence of a contract or a legally protected interest between the plaintiff and the corporation, (2) the corporate officer's knowledge of the contract, (3) the officer's intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome, (4) absence of justification on the part of the officer, (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer. 9 to 5 Fashions, Inc., supra at 234.
To state a cause of action for intentional interference with a contract, the plaintiff must allege and prove a breach of contract. Moreover, a plaintiff must prove that the corporate officers acted outside of their corporate authority or in a manner they knew to be detrimental to the corporate interest. Hemmans, supra at 77. In Hemmans, this court reversed a jury verdict awarding damages against several officers of State Farm for the discriminatory adverse impact of their administration of State Farm's program. This court found that the agents failed to prove both a breach of contract and lack of justification. Id.
Two issues confront this court regarding Rayborn's claim for intentional interference with his contract: who bears the burden of proving that the officer acted without justification and whether the officer's motive constitutes sufficient proof *1156 of unreasonable justification. We believe the plaintiff claiming intentional interference with a contract bears the burden of proving that the corporate officer acted without reasonable justification.[7]9 to 5 Fashions, supra at 234, Hemmans, supra at 77, Constance v. Jules Albert Construction, Inc., 91-0384 (La.App. 4 Cir. 12/11/91), 591 So.2d 1238, 1239, Laneco Construction Systems, Inc. v. Lanehart, 97-2871 (La.App. 1 Cir. 12-28-98), 723 So.2d 1127, 1132, Yarbrough v. Federal Land Bank Association of Jackson, 24,606 (La.App. 2 Cir. 3/31/93), 616 So.2d 1327, 1334. Moreover, we believe that the Supreme Court in 9 to 5 Fashions, Inc. explained that the plaintiff must prove either that the corporate officer acted without authority (not argued in this case) or that the corporate officer acted knowingly contrary to the best interest of the corporation.
Astugue admitted he knew of the employment contract between Sun and Rayborn. Rayborn argues that Astugue intentionally acted against Sun's best interests by failing to respond honestly to Rayborn's request for performance evaluations, and that these misrepresentations rendered performance under the contract more burdensome.
The record contains evidence, Astugue's admissions, that he did not report to Rayborn the majority shareholders' concerns or misgivings about Rayborn's performance with Sun in his evaluation in December 1996. We fail to find any evidence in the record that such omissions rendered Rayborn's performance under the contract more burdensome. Moreover, the record contains no evidence that these omissions caused Sun damage. Rayborn did not testify that Astugue's comments made his employment unpleasant or more difficult. We cannot infer such conclusions from the facts supported by the record.
Rayborn sold a majority interest in his company to Heller and his partners in 1995. Sun continued to employ Rayborn. Rayborn remained Chief Executive Officer and continued his involvement with Sun in product development. Rayborn and Heller's relationship deteriorated over a very short period of time. In late 1996, Heller and his partners, with Astugue's input, sought help from various companies on selling Sun. Rayborn admits that he knew about and supported efforts for the sale of Sun, but he complains that Heller did not include him in these attempts to find a buyer for Sun. Heller, his partners and Astugue were not entirely truthful with these potential buyers and agents in representing Sun's potential liability to Rayborn. Moreover, Heller and his partners attempted to buy Rayborn's entire interests in Sun for significantly less than these interests were worth. However, Rayborn declined all such offers. At approximately the same time, Rayborn asked Astugue for his opinion regarding these buyout offers and an evaluation of Rayborn's performance under his employment contract. In response, Astugue encouraged Rayborn to sell his interests in Sun (informing him that such a course of action would prove beneficial to Astugue personally since the Heller group had promised him certain remuneration if and when Rayborn's 25% ownership interest in Sun returned to Sun), and he told Rayborn that Sun found his performance satisfactory. Shortly thereafter, Heller, Hickox, and Astugue *1157 met with legal counsel to consider terminating Rayborn. On 11 March 1997, a majority of Sun's board of directors directed Astugue to terminate Rayborn. Astugue terminated Rayborn on 17 March 1997. Thereafter, at a formal meeting of Sun's board of directors, a majority of the board ratified Astugue's termination of Rayborn. Termination of Rayborn's royalty contract constituted a significant decrease in Sun's future liabilities, indirectly benefiting Heller and his partners. The trial court found that this termination conferred a personal benefit upon Astugue. Although we are not convinced that the record contains any evidence of such a benefit upon Astugue, we will assume for purposes of argument that the termination conferred such a benefit.
However, we fail to see how these facts, accepted as true by this court on appeal, state a cause of action for intentional interference with a contract. Rayborn failed to prove that Astugue's actions caused the alleged breach or rendered Rayborn's performance more burdensome. Rayborn offered no evidence that Astugue's actions harmed Sun. Accepting as true the trial court's findings of fact, we cannot conclude that Rayborn stated a cause of action against Heller, his partners or Astugue for intentional interference with a contract.
As proof of Astugue's lack of justification for his actions, the trial court and Rayborn rely exclusively on Astugue's alleged motives. We do not believe that proof of the corporate officer's motive, without more, sufficiently establishes that the officer acted to the detriment of the corporation. In considering what facts establish that the officer acted contrary to the best interest of the corporation, we have considered various cases. In Yarbrough, the plaintiffs alleged that the Bank's president refused, without any allegation regarding motive, to sell its defaulting debtor's land to certain individuals connected with the debtor for a greater amount than the amount for which the bank actually sold the land. Supra at 1335. However, the Third Circuit Court of Appeal in a subsequent case held that "in order to have the benefit of the corporate veil, Kaplan [the corporate officer] must have acted with a `proper motive' to be granted the protection of the privilege which encompasses the scope of his intent to act in the best interest of the corporation at the time of the unlawful eviction. If Kaplan's motive was malicious in breaching the lease with Kite, then his actions were without `justification' and the final element of proof to hold Kaplan personally responsible for the breach of the lease will have been met." Kite v. Gus Kaplan, Inc., 97-57 (La.App. 3 Cir. 2/18/98), 708 So.2d 473, 481, writ granted 98-0715, 98-0751 (La.5/13/98), 719 So.2d 58, affirmed in part, amended in part, and reversed in part 747 So.2d 503 (La.11/17/99). The court held that "the facts of the breach of the lease establish that Kaplan acted deliberately and maliciously to drive Kite out of business and off the premises." Id. The Supreme Court did not specifically address the issue of Kaplan's personal liability for his actions as a corporate officer. We find the facts in this case distinguishable from the facts in Kite. We find no evidence in the record before us to support a conclusion that Astugue acted maliciously in his evaluation or termination of Rayborn. Although the trial court found that Astugue acted selfishly in his dealings with Rayborn, such actions do not prove malice or ill will. Furthermore, we believe the plaintiff, to satisfy his burden of proof, must establish by a preponderance of the evidence that the corporate officer acted without authority or contrary to the *1158 best interest of the corporation. His motive, whether malicious or selfish, is certainly a factor to be considered, but the plaintiff cannot rely on such evidence alone. In Rayborn's case, Astugue had some personal incentive to want Rayborn to return his share of Sun to the corporation. However, the record is equally clear that his motive for his positive, albeit evasive, evaluation of Rayborn's performance concerned Sun's best interest. Astugue was in a difficult situation: the majority and minority shareholders of his corporate employer were in an acrimonious battle for control of the company; Rayborn was his long-time friend and mentor but the Heller group now owned the controlling interest in Sun; and Rayborn repeatedly antagonized the situation. We believe the record clearly establishes Astugue's "mixed motives." Note, Piercing the Corporate Veil: Personal Liability for a Corporate Officer for Intentional Interference with Contract: 9 to 5 Fashions, Inc., v. Spurney, 51 La.L.Rev. 141, 158 (1990). When such "mixed motives" are involved, we believe that "courts should carefully analyze the effect of the corporate actor's actions. Corporate officials must be protected from the pressures attributed to the prospect of personal liability in the corporate decision-making process. Any doubt or lack of proof as to the `good faith' of the corporate actor should be resolved in favor of protecting the corporate actor, provided that his actions were in the best interest of the corporation." Id. By the time Astugue responded to Rayborn's request for an evaluation in December 1996, the relationship between the shareholders had deteriorated to such a state that we cannot believe the evaluation effected either Rayborn's conduct or the majority shareholder's decisions. We believe the result in this case is further supported by the Supreme Court's directive that it did not intend to "adopt whole and undigested the fully expanded common law doctrine of interference with contract, consisting of `a rather broad and undefined tort in which no specific conduct is proscribed and in which liability turns on the purpose for which the defendant acts, with the indistinct notion that the purposes must be considered improper in some undefined way.'" MD Care, Inc. v. Angelo, 95-2361, 95-2362 (La.App. 4 Cir. 3/20/96), 672 So.2d 969, 973, quoting 9 to 5 Fashions, supra at 234. (Emphasis added.) Moreover, in reaching our conclusion, we appreciate the wisdom of the Supreme Court's pronouncement in this area of the law recognizing the broad basis for delictual liability furnished by LSA-C.C. art. 2315, but we also recognize the need to avoid blurring the distinction between tort claims and contract claims. The rules governing contract disputes and breaches are separate from those governing offenses and quasi offenses, and these separate legal domains should not overlap unless there is a duty on the part of the person or legal entity, separate and apart from the obligations created by the terms of a contract. Spears v. American Legion Hospital, 00-865 (La.App. 3 Cir. 1/31/01), 780 So.2d 493, 497. The parties do not argue that Astugue acted without authority. Rayborn has sued for an alleged breach of contract by Sun. The trial court found that the shareholders and Astugue personally derived a financial benefit from their actions in terminating Rayborn. Although we do not necessarily disagree with this finding, we further recognize that Rayborn's termination conferred a direct financial benefit upon the corporation, Sun, and only indirectly benefited the shareholders. Because Rayborn did not prove that Astugue's actions adversely effected Sun or proved contrary to the best interest of Sun, we reverse the trial court's judgment finding Astugue *1159 intentionally interfered with Rayborn's contract with Sun.

CONCLUSION
For the above reasons, we reverse the judgment of the trial court awarding Rayborn damages for breach of contract, fraud, breach of fiduciary duty and intentional interference with a contract. Costs in the appeal are assessed against both plaintiff and defendants equally.
REVERSED.
MURRAY, J., concurs in part and dissents in part with reasons.
MURRAY, J., concurring in part and dissenting in part with reasons.
I agree with the majority's reversal of the award of $726,591.00 for 1993 and 1994 taxes because, even if this obligation were proven to exist, the evidence does not support a finding that the corporation's failure to pay the alleged debt was wrongfully induced by any of the individual defendants. To the contrary, it is clear that it was in the best interests of the corporation for the directors and officers to negotiate a settlement of Mr. Rayborn's claim, and that there was an ongoing attempt to do so. Thus, there is no legal basis for holding the individual Sun officers, directors or shareholders liable for this debt. Accordingly, I concur with the majority's determination that none of the individual defendants can be held liable for the $726,591.00 awarded in the judgment.
In contrast, however, the record fully supports the trial court's factual determinations that Mr. Rayborn's employment and royalty agreement was terminated without sufficient cause under that contract, and that the individuals who effectuated that termination were acting in their own interests, rather than the corporation's. Because I thus find that these individuals[1] are personally liable for intentional interference with the contract, as established in 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228 (La. 1989) and its progeny, I must dissent from the majority's reversal of the judgment in its entirety.
One example of the evidentiary support in the record is that which relates to the "check-writing incident." Although this had occurred in August 1995, the corporate officials did not decide until eighteen months later, in March 1997, that Mr. Rayborn had thereby taken action justifying termination of Sun's obligations under the contract. While Sun's witnesses explained at trial that the delay was because they hoped it would be an isolated incident, their reaction at the time the incident occurred suggests that, as Mr. Rayborn intended, they perceived it as a simple negotiating tactic.
Mr. Rayborn testified, and no one disputed, that a promise to pay his Sunrelated 1994 taxes had been made in February, but six months later the tax bill was coming due and nothing had been paid. Because there had been no explicit change in his authority to write checks for the company, he openly obtained a blank check from the secretary, wrote the check for the necessary amount, and then provided the amount the next day for bookkeeping purposes. Mr. Rayborn explained at trial that he "wanted to bring the issue before the Board, and that was the primary reason I wrote the check ... and I felt very comfortable that I had not placed the company in any financial position that would be *1160 detrimental."[2] Notably, it was only weeks later that the Board voted to immediately pay Mr. Rayborn $75,000 towards the tax obligation, and concrete steps finally were taken to negotiate the total amount due. Based upon this testimony and evidence, the trail court could reasonably conclude that this August 1995 "check-writing incident" was merely a pretext offered by the corporate officials for their March 1997 declaration that Mr. Rayborn had "taken action without the authorization of the Board of Directors of [Sun] which is reasonably likely to have a material adverse impact on [Sun]," as required under the contract.
Similarly, the evidence supports the trial court's rejection of the corporate officials' claim that the termination was justified, and in fact necessitated, by Mr. Rayborn's March 6, 1997 request for Mr. Astugue's signature on a $1.3 million "IOU." Although Sun's witnesses portrayed this action as fraudulent, it was shown that the letter was not something Mr. Rayborn concocted and backdated to February 1995, but was instead just one of the many drafts bounced between the parties since the closing in an attempt to document Sun's admitted promise to reimburse him for his Subchapter-S tax liability. Moreover, while the corporation's witness claimed Mr. Rayborn's action was "reasonably likely to have a material adverse impact" on Sun's loan agreements, it was shown that the lender's attorneys had not only agreed that he was entitled to documentation of the obligation, but had also participated in drafting the document Mr. Rayborn presented to Mr. Astugue. Given the additional evidence presented at trial, and particularly the revelation that Mr. Heller had begun investigating a means to eliminate Sun's royalty obligation before this incident, there is no manifest error in the trial court's determination that Mr. Rayborn's termination was unjustified under the contract.
Most significantly, there was ample evidence supporting the trial court's conclusion that terminating Mr. Rayborn's contract was not in the best interests of the corporation, but instead was intended to personally benefit the majority shareholders. This evidence includes the fact that the purchase of the seventy-five percent ownership interest was financed by a massive loan to Sun Drilling, without any significant capital investment from the new shareholders; that, in comparison, it appeared the company could now be sold for at least $25 million, most of which would go to Mr. Heller and his partners;[3] and that Mr. Rayborn had so far rejected their offers to not only purchase his stock, but to buy out his ten-year royalty interest. In contrast, while Mr. Rayborn's continued services had been an essential element of the purchase negotiations in 1994-95, his termination in March 1997 left Sun Drilling without the key person involved in creating new products from which the corporation could derive profits and growth.[4]
Thus, the portion of the judgment casting the individual defendants for the salary, fringe benefits, royalties and attorney fees is fully supported by the evidence, which establishes that those individuals *1161 are liable for their intentional termination of Mr. Rayborn's rights under his contract with Sun Drilling. Accordingly, I would affirm that portion of the judgment.
NOTES
[1] The Rayborns include Jerry J. Rayborn, his wife and sons who owned a percentage of Sun.
[2] Rayborn testified that this amount was paid in partial payment of the $1.3 million debt and the defendants testified that Sun paid this amount to Rayborn to compensate him for his 1994 personal tax liability.
[3] John Tuten became a shareholder in Sun after the Merger Agreement. However, he was not a partner in the HHDS & P partnership. Moreover, the judgment did not award any damages against this shareholder.
[4] Sun employed Susan Reese as corporate secretary. Before trial, all claims were dismissed against Reese.
[5] The parties agreed to a determination after trial of the amount of attorney's fees and costs.
[6] From this conclusion and the evidence in the record, we can only believe that Sun maintained two sets of books, one for internal use and one version which it maintained for the public, including its creditors.
[7] We are aware that some cases have held or implied that the burden of proving reasonable justification rests with the defendant. WKG-TV v. Reynolds, 618 So.2d 1023, 1027 (La. App. 1 Cir. 4/19/93), Kite v. Gus Kaplan, Inc., 97-57 (La.App. 3 Cir. 2/18/98), 708 So.2d 473, 481, writ granted 98-0715, 98-0751 (La.5/13/98), 719 So.2d 58, affirmed in part, amended in part, and reversed in part 747 So.2d 503 (La.11/17/99).
[1] Although 9 to 5 Fashions dealt only with the personal liability of a corporate officer, the rationale extends to others whose intentional acts lead to the wrongful breach of a contract. See, e.g., Neel v. Citrus Lands of La. Inc., 629 So.2d 1299, 1301 (La.App. 4th Cir. 1993).
[2] Although the majority states that Mr. Rayborn admitted he "wrote this check to antagonize the individual investors," Mr. Rayborn merely answered affirmatively when Sun's counsel asked if he "wrote that check out to get somebody's attention?"
[3] In the interim, Sun Drilling paid HHDS&P monthly management fees totalling $125,000 for 1995 and $405,000 for 1996.
[4] Sun's counsel repeatedly emphasized the importance of Mr. Rayborn's services to the company's continued prosperity during his cross examination of this witness.