MOLAISON, J.
*963 In this civil action for rescission, breach of warranty and fraud, appellants, who purchased a home from the appellees, appeal a judgment finding in favor of appellees following a trial on the merits, as well as a subsequent award of costs to appellees. For the reasons that follow, we affirm.
PROCEDURAL HISTORY
On August 13, 2015, appellants, Zozette and Bryan Adam Reed ("the Reeds"), filed a petition alleging breach of warranty and fraud by appellees, Kathy and Mark Mitchell ("the Mitchells"), related to the sale of the Mitchells' home to the Reeds. An amended petition was filed on April 22, 2016. A judge trial on the merits of this matter was held on May 8, 2018. On that same date, the court ruled in favor of appellees and dismissed appellants' claims with prejudice. On July 31, 2018, the court awarded appellees $11,500 for reimbursement of costs. Appellants thereafter sought the instant suspensive appeal, which was granted on August 27, 2018.
FACTS
The record shows that, on or about January 10, 2015, the Reeds contacted the Mitchells for the purpose of inquiring about the Mitchells' home, located at 1009 Moss Lane, which was for sale by owner in the River Ridge area of Jefferson Parish. The Reeds subsequently made a verbal offer to purchase the Mitchells' home, and the parties entered into a written purchase agreement on January 11, 2015. Within the inspection period that followed, the Reeds sought information from the Mitchells regarding whether the home had a history of flooding. In particular, the Reeds were concerned about one feature of the home, a sunken den which was constructed below grade, and whether that part of the home was prone to flooding as well.
Mrs. Reed testified that during the first visit to the home, the Mitchells told her and her husband that "exterior waterproofing" had been done because of "little spots of water" that had appeared on the floor of the sunken den in the past. The Reeds received a verbal disclosure from the Mitchells prior to the sale, but did not obtain a copy of the written disclosure until after the sale.[1] The information provided verbally and in writing was consistent: the home had flooded in 1995, and there had also been foundation repair/exterior waterproofing done. The Reeds had an independent inspection done on the home as well, but the inspection did not reveal that water had entered into the sunken den.
The act of sale took place on February 26, 2015. Mrs. Reed testified that flooding issues began in April of 2015, when the *964 den flooded after a heavy rainstorm. In trying to determine a cause of the flooding, the Reeds looked through a folder of information on the home that Mrs. Mitchell had given them, and they located a 2011 document from Dixie Waterproofing regarding interior work to the den that they were previously unaware of. After the flooding, it was discovered that the outlets in the den were rusted, indicating that water had entered through the outlets at some point in the past.
After making a claim on their flood insurance, the Reeds' policy was canceled a week later when FEMA sent the insurer notice of prior losses on the property. The new insurance premium was $1,300 more than the Reeds had been paying. Along with the cancelation notice, the Reeds received a copy of the home's flood history and learned that there had been five flood claims paid on the house. The Mitchells had only told them about the 1995 flood, which occurred after the Mitchells originally purchased the home.
Mrs. Reed thereafter went to Jefferson Parish's Repetitive Loss Office and filed a public records request to learn the full history of water intrusion at the house. From that request, the Reeds learned about concrete that had been poured on the property and that the Mitchells had applied for an elevation grant to lift the home. To that point, the Reeds had not been told that concrete was poured on the slab in 2000 in an attempt to stop water intrusion, and they had not been told about an application for a FEMA grant.
A second flooding event occurred in October of 2015, when water came through the electrical outlets into the den. On July 22, 2016, the den flooded for the third time. The Reeds insurance claim for the 2016 flood was denied. On August 5, 2017, following a large storm, the den flooded a fourth time. Damages from the 2017 flood were covered by FEMA.
The Reeds put the house on the market in spring of 2017. In the disclosure for the house, the Reeds incorporated the entire flooding history they had learned.[2]
By the time of trial, the Reeds had hired approximately 10 contractors and engineers to try to solve the flooding issue. Estimates to stop the flooding ranged as high as $200,000. Mrs. Reed testified that she would not have purchased the house if she had known all of the information that she had learned after purchasing the house. Mrs. Reed indicated that she wanted the Mitchells to take the house back.
On cross examination, Mrs. Reed reviewed the property disclosure and admitted that the house was sold to them without a warranty from the Mitchells. Mrs. Reed stated that water intrusion in the sunken den was discussed with the Mitchells from her very first visit to the home. The Reeds were not prohibited or limited in any way by the Mitchells from having the home inspected prior to the sale. The Reeds' home inspection report, which was received prior to the sale, indicated that the home had subsurface drains and a sump-pump, as well as a water proofing membrane.
Bryan Reed testified that initially he was not verbally advised by the Mitchells about water intrusion issues. He stated that after receiving the home inspection report, he asked the Mitchells about the waterproofing membrane referenced in the report, at which time they told him about the exterior work that was done in 2011. Mr. Reed contended that the Mitchells described the water intrusion in the sunken *965 den as a minimal amount that could be cleaned up with a towel. Over the course of several conversations, the Mitchells told Mr. Reed that the exterior waterproofing by Dixie Walls had stopped water intrusion in the den. Mr. Reed said that the Mitchells did not tell him about a terra cotta pipe under the house, floods that had occurred prior to Mitchells' ownership, their 2009 or 2011 water intrusion claims, 1998 waterproofing work, work in 2000 to add to the concrete slab in the sunken den, 2012 interior waterproofing by Mr. Charbonnet, or about their application for a 2012 FEMA grant to elevate the house.
Kathy Mitchell testified that she and her husband decided to put their house up for sale by owner. Shortly after listing the home online she was contacted by Zozette Reed to set up an appointment to view it, and the Reeds eventually made a total of four visits before the sale.[3] Mrs. Mitchell stated that everything she told the Reeds verbally about water issues in the house was ultimately put into the written disclosure. This specifically included the 1995 flood as well as water intrusion in the sunken den. Mrs. Mitchell recalled that her husband gave Mr. Reed the FEMA document, as well as information about the 2009 and 2011 claims made for water intrusion. She personally told the Reeds about the steps that were taken to address the water intrusion issues in the den, and testified that she believed the water intrusion problem was resolved in 2012 after Peter Charbonnet installed an exterior waterproof membrane around the home. She stated that she had never seen water come through the electrical outlets as the Reeds had described. With respect to the FEMA grant to have the house raised, Mrs. Mitchell stated that she made the application because the program was available for anyone to use and many people were taking advantage of the opportunity. Mrs. Mitchell admitted that she did not provide information to the Reeds about flooding that occurred prior to the time that the Mitchells owned the house.
Upon being recalled as a witness by the defense, Mrs. Mitchell clarified that she was never a real estate agent at the firm where she worked, but was only a receptionist who also sent out marketing materials. She emphasized that she told the Reeds about the flood of 1995, as well as the small water intrusions in the den, which the Mitchells hired Dixie to repair. Mrs. Mitchell showed the Reeds the document from Dixie that documented the repairs. Finally, Mrs. Mitchell denied that she and her husband pressured the Reeds into buying the house.
Mark Mitchell testified that he bought house in question in 1993. In 1996, he first noticed that puddles of water would form in the sunken den. He recalled that a very large puddle formed in the den in 1998. Mr. Mitchell described the water intrusion in the den as occasional and minimal, and said that was what he generally told the Reeds about the issue. Mr. Mitchell told the Reeds about the "drill" he had in place to move furniture from the den if water was present, and he showed the Reeds were they could put their own furniture up, if necessary.[4] He stated that he had *966 never seen water come in through the sockets, as the Reeds had experienced. The Mitchells' home insurance provider never paid a claim for water intrusion in the den because there was not enough water in either instance to be considered a flood.[5]
With respect to the work that was done to stop water intrusion in the sunken den, Mr. Mitchell testified that, in 2000, he had a contractor pour one or two inches of concrete over the slab, and it looked terrible. Mr. Mitchell stated that he told Mr. Reed about Pete Charbonnet before the closing and gave him Charbonnet's name and number. He recalled that after Charbonnet came out for the second round of work, there was no more water intrusion in the den. Mr. Mitchell testified that after the inspection report, he again talked to the Reeds about water intrusion. He told Mr. Reed that he cleaned the back yard drains every time it rained. He also showed Mr. Reed a copy of his flood insurance bill before the sale. Mr. Mitchell stated that he had no personal knowledge of the home's flood history that may have occurred before he lived there.
The Mitchells tried to get a FEMA grant to raise the house in 2010. At that time the couple worked with Orleans Shoring, who put the application package together. Finalization of grant application was accomplished five or six months after work on the waterproofing was completed by Charbonnet, but the process began two years prior to Charbonnet beginning work. Mr. Mitchell testified that he believed that the house was waterproofed at the time he sold it to the Reeds. There was no water intrusion in the den from 2012 until he sold the house. Mr. Mitchell stated that he was not educated on the products that Charbonnet used to waterproof the house. Prior to the instant litigation, he had no knowledge of a terra cotta pipe under the home, but Charbonnet told Mr. Mitchell to call Jefferson Parish to have the pipe inspected. The Parish told him that the entire house would have to be dug up to look at the pipe, and so he passed on doing it at that time.
On cross examination, Mr. Mitchell testified that he did not tell the Reeds about the floods he had relayed to FEMA in connection with the grant application, which occurred before he purchased the home. He stated that he had not told the Reeds about the work that Southeast Distributors did in 1998 to waterproof the outlets in the den, or the work in 2000 to pour concrete on top of the existing slab. Mr. Mitchell did not tell the Reeds about the 2009 or 2011 insurance claims for small water intrusions. He did not intend to defraud the Reeds in selling them the house.
Peter Charbonnet testified that he owns a stucco and waterproofing company. He knew the Mitchells prior to being hired by them to waterproof their sunken den in September of 2011. Initially, he waterproofed the exterior of the living room. After that, he returned months later to address a small amount of water that was still getting into the house, by installing a membrane on the inside of the den. For three years, the Mitchells had no more water intrusion problems. Charbonnet stated that the Mitchells had never experienced *967 water coming through the receptacles in the den in the same way that the Reeds had. Charbonnet noted that the Mitchells had consistently maintained the exterior drains around the home.
In 2015, Charbonnet received a phone call from Mr. Reed about water intrusion in the den coming through the receptacles. He recalled that he had found a terra cotta pipe the first time he dug in the yard, but he did not conclude at that time that the terra cotta pipe was causing water intrusion in the house.
ASSIGNMENTS OF ERROR
On appeal, appellants allege four assignments of error:
1. The Trial Court committed legal error in applying the incorrect burden of proof to Plaintiffs' claim for fraud.
2. The Trial Court committed legal error in applying the incorrect burden of proof to Plaintiffs' claim for redhibition.
3. The Trial Court committed clear manifest error if it made any credibility determinations in favor of Defendants.
4. The Trial Court's assessment of costs was erroneous based on its other errors.
LAW AND ANALYSIS
The central issue of the matter before us is whether disclosures that the Mitchells made to the Reeds prior to the sale of the home, with respect to the potential for water intrusion in the sunken den area, amounted to fraud sufficient to vitiate the contract between the parties.
A seller warrants the buyer against redhibitory defects in the thing sold. La. C.C. art. 2520. A defect is redhibitory when it either renders the thing useless or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect, or it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. Id.
Though a buyer is entitled to the warranty against redhibitory defects, it can be expressly waived. Newton v. Dongieux , 13-776 (La. App. 5 Cir. 6/24/14), 145 So.3d 478, 485. If a valid waiver exists, then a buyer can only obtain relief if he can show fraud in the inducement of the contract. Id. , citing Shelton v. Standard/700 Associates , 01-587 (La. 10/16/01), 798 So.2d 60, 64. "A warranty against redhibitory defects is not effective if the seller commits fraud, as defined in the civil code, upon the buyer." Id.
A contract is formed by the consent of the parties. La. C.C. art. 1927. Nonetheless, consent may be vitiated by fraud. La. C.C. art. 1948. "Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." La. C.C. art. 1953. "Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill." La. C.C. art. 1954.
There are three elements for fraud against a party to a contract: (1) a misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by the fraudulent act must relate to a circumstance substantially influencing the victim's consent to the contract. Newton, supra .
Fraud need only be proven by a preponderance of the evidence and may be established by circumstantial evidence. La. C.C. art.1957;
*968 Shelton v. Standard/700 Associates , 01-0587 (La. 10/16/01), 798 So.2d 60, 64. Circumstantial evidence, including highly suspicious facts and circumstances, may be considered in determining whether fraud has been committed. See Sun Drilling Products Corp. v. Rayborn , 00-1884 (La. App. 4 Cir. 10/3/01), 798 So.2d 1141, 1153, writ denied , 01-2939 (La. 1/25/02), 807 So.2d 840 ; Comment (b), La. C.C. art.1957.
In the instant case, the home was sold with a waiver of redhibition. The parties were consistent in their trial testimony that the issue of water intrusion in the sunken den was disclosed by the Mitchells prior to the sale of the home, although the accounts about the timing and detail of the disclosure varies by witness. It was also established at trial that the Mitchells actively took steps to eliminate water intrusion in the den during the time the family lived in the home. Testimony by the Mitchells and Charbonnet demonstrated that the issue of water intrusion in the den was resolved in 2012.
We find that any shortcoming(s) in the Disclosure Form ("the form") were of very limited significance. First, the form's obligations, rights, and remedies apply only to the purchase agreement or to any other written agreement executed prior to the act of sale, but not to the act of sale itself. This is specified in the definitions section of La. R.S. 9:3196(4), and is the clear and logical intent throughout the Chapter 7. Secondly, all rights, obligations, and remedies provided by La. R.S. 9:3198 expired 72 hours after the form was provided to the Reeds (albeit late) as per La. R.S. 9:3198 B(3)(a), and even then the remedy provided would have been modification or cancellation of the purchase agreement, but not the sale. Further, the rights, obligations, and remedies of Chapter 7 were waived and terminated at act of sale ("transfer of title") or upon occupation of the house, as provided by La. R.S. 9:3198 B(3)(b). Lastly, a sale cannot be invalidated due to the failure of a seller to comply with the requirements of Chapter 7, as provided by La. R.S. 9:3198 B(3)(c). Thus, with the waiver of redhibition, the Reeds' only remedy was proving fraud, a difficult burden.
We recognize that the intended evidentiary significance of the form is, in part, that the form did not reveal all previous water events, and Mrs. Mitchell stated that she thought everything that she had told the Reeds verbally was included on the form. However, Mr. Mitchell's testimony indicates that he verbally told the Mitchells more than was written in the form.
In Rogers v. Malbrough , 14-402 (La. App. 5 Cir. 1/28/15), 167 So.3d 868, we considered a similar issue. In that case, the seller of a home had an incident of water intrusion in the garage which he thought was resolved after a roof replacement years prior to the sale of the home. Unlike the appellees in the instant case, the seller in that case did not disclose the leak at all to the sellers. On appeal, we found no error on the part of the trial court in finding the seller's testimony to be credible. We further found no error in the trial court's determination that the seller did not commit fraud against the buyers concerning the water leakage problems with the home, where the record did not reasonably support a finding that the seller intended to obtain an unjust advantage or cause damage or inconvenience to the buyers. Id. at 872-74.
The Reeds also make a more general allegation that the Mitchells concealed from them the complete history of flooding that occurred in the home. It is not disputed that the Mitchells advised the Reeds of the only incident when the entire home flooded in 1995 after the Mitchells had purchased the property. While incidents *969 of water intrusion did occur while the Mitchells lived in the home, these were not classified as "floods" by the home's insurer. And, as discussed above, the water intrusion in the den was believed to have been stopped completely in 2012. Kathy Mitchell testified that she did not have information about prior floods from the previous owners, but that her husband had given the Reeds "documentation from FEMA" that included the denial of the Mitchells' 2009 and 2011 claims for water intrusion. Mark Mitchell testified that on approximately the third visit with the Reeds, they had questions about the cost of flood insurance, at which time Mr. Mitchell showed the Reeds a copy of flood insurance documents that included a page referred to as a "Claims Record." Mr. Mitchell stated that he had no personal knowledge of the floods referred to in the claims record that occurred before he purchased the home. However, Mr. Mitchell was advised by Orleans Shoring that he needed to use information from the claims record to complete the grant application to have the home raised, which he did. Even assuming that the Mitchells made no disclosure to the Reeds about the home's history of flooding prior to the Mitchells' purchase, the record indicates that the Reeds were well aware that the home was in a flood zone that required flood insurance to be in place. Further, as evidenced by Mrs. Reed's act of obtaining from the Jefferson Parish Repetitive Loss Office a record of every flood that had occurred at the home from the time it had been built, including those events that took place prior to the Mitchells' purchase of the home, we cannot say that this information was not otherwise readily available unless the Reeds experienced difficulty or inconvenience, or utilized some special skill, as anticipated by La. C.C. art. 1954.
In its March 8, 2018 judgment, the trial court ruled that after considering the law and evidence, the Reeds had not met their burden of proof on their redhibition or fraud claims. When findings of fact are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the findings, for only the fact-finder is cognizant of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Schmuck v. Menees , 13-557 (La. App. 5 Cir. 12/12/13), 131 So.3d 277, 280. Thus, given the trial court's broad discretion as the fact-finder, upon review we find no error in the trial court's determination that the Mitchells did not commit fraud against the Reeds concerning the water leakage problems with the home encountered by the Reeds. The record does not reasonably support a finding that the Mitchells intended to obtain an unjust advantage or cause damage or inconvenience to the Reeds.
Accordingly, we also find no error in the trial court's subsequent award of costs to the Mitchells.
DECREE
Accordingly, for the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED
CHAISSON, J., DISSENTS WITH REASONS
Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction. La. C.C. art. 1953.
The Mitchells claim that they disclosed the issue of "water intrusion" into the home prior to the sale. However, in the Property Disclosure Form, the Mitchells *970 only disclosed a single flood event in 1995, which was a well-known flood event that affected many homes throughout the New Orleans area.[6] The form also described repairs to the den to prevent "occasional minimal water intrusion." Although the Mitchells provided the backdated Property Disclosure Form to the Reeds a few months after the date of the sale, Mrs. Mitchell testified that they put everything in the Property Disclosure Form that they verbally told the Reeds about water issues in the home.
Clearly, the Property Disclosure Form, which by Mrs. Mitchell's admission is the same information verbally related to the Reeds, misrepresents the well-documented, decades-long history of water intrusion that occurred in the home. The evidence in the record indicates that the "water intrusion" was neither occasional nor minimal: the home flooded regularly between 1979 and 2009 and caused extensive damage to the property necessitating very costly repairs. The Mitchells' own witnesses testified that there were regular "drills" to move furniture during heavy rains. This testimony belies the assertion that the water intrusion was occasional and minimal. Additionally, the advertisement for the home omits any reference to water intrusion and describes the home as 'move-in' ready.
The Mitchells also maintained that by April of 2012 they had repaired the defects that allowed water intrusion into the home and that they therefore had no duty to disclose those defects. However, in November of 2012, the Mitchells applied for a FEMA grant to have the home elevated. In the FEMA application, they documented an extensive history of flooding and water intrusion in the home going back to 1978, and they submitted the application knowing that they would be responsible for paying 10% of the $245,000 cost to elevate the home. It is simply not credible to believe that in addition to the many thousands of dollars they had already spent on the issue of water intrusion, the Mitchells were willing to spend an additional $24,500 to elevate the home if they believed they had rectified the problem and there was no future risk of water intrusion.
The Mitchells were clearly aware of a long history of flooding and water intrusion particular to their home. They were obligated to disclose this information to the Reeds. The Mitchells cannot escape this obligation merely by providing unsubstantiated, self-serving testimony that they believed these issues were resolved. In order for the trial court to find that the Mitchells fulfilled their obligation of disclosure, it would necessarily have to find the Mitchells' testimony credible. The Mitchells' testimony was so internally contradictory and inconsistent with the documentary evidence that, in my opinion, the trial court was manifestly erroneous in accepting their testimony.
Accordingly, I would reverse the judgment of the trial court, render judgment, in favor of the Reeds, finding that there was fraud in the inducement for the purchase of the home, and remand the matter to the trial court to determine the appropriate measure of damages in light of the fact that the Reeds have now sold the home.

Mrs. Reed indicated that she and her husband received the written disclosures after the closing in February, but Mrs. Mitchell asked the Reeds to back date the document to January. The Reeds complied with this request.

New information from the Mitchells' FEMA application included a report of a 1983 flood, which happened before the Mitchells owned the home.

Jessica Jones, the Mitchells' daughter, testified that she grew up in the home and recalled the May flood in 1993 and a 1998 water intrusion with a small amount of water. She also recalled a furniture "drill" that happened during a heavy rain. She did not see water in the house after 2012. Jones testified that she was there when the Reeds came to look at the house and she saw her mother go over a file with them. She stated that her parents had a backup offer on the home at the time it was up for sale.

Michael Bergeron testified that he was a neighbor of the Mitchells, who helped them to move furniture from the sunken den during a heavy rainstorm prior to 2012. Bergeron did not help to move furniture again after 2012, nor did he ever see another incident of water intrusion in the home, although he was a guest there on a regular basis.

Rick Maraist is an insurance agent who wrote the Mitchells' flood policy in 2009. He testified that in 2009, he looked into a water intrusion at the Mitchells' home, but the event did not qualify as a flood, and the adjuster did not classify it as a flood.

The Property Disclosure Form asks "[h]as any flooding, water intrusion, accumulation, or drainage problem been experienced with respect to the land?" and "[h]as the structure on the property ever taken water by flooding?"